# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF NORTH CAROLINA
# CHARLOTTE DIVISION
# 3:05 CV 373-H

| | |
|---|---|
| **NEW YORK MARINE AND GENERAL INSURANCE COMPANY**, a New York Corporation, <br><br> **Plaintiff,** <br><br> v. <br><br> **BECK ELECTRIC CO., INC.**, a North Carolina Corporation, and **JAMES E. BECKER,** <br><br> **Defendants.** | **MEMORANDUM AND ORDER** |

**THIS MATTER** is before the Court on the following motions and memoranda:

1. the "Plaintiff's Motion for Summary Judgment . . ." (document #14), "Brief in Support . . ." (document #15), and "Affidavit . . . in Support" (document #16), all filed October 12, 2006;

2. the Defendants' "Memorandum Opposing Plaintiff's Motion for Summary Judgment" (document #17) and "Affidavit of James E. Becker" (document #18), both filed October 30, 2006;

3. the Plaintiff's "Reply Brief . . ." (document #19) filed November 13, 2006;

4. the "Plaintiff's Objection to and Motion to Strike Portions of the Affidavit of James E. Becker" (document #20) and ". . . Brief in Support . . ." (document #21), both filed November 13, 2006;

5. the Defendants' "Memorandum Opposing Plaintiff's Objection to and Motion to Strike Portions of the Affidavit . . ." (document #22) filed November 30, 2006;

6. the Defendants' "Motion for Judicial Notice of Adjudicative Facts" (document #23) filed November 30, 2006;

7. the Plaintiff's "Reply Brief in Support of . . . Motion to Strike . . ." (document #24) filed December 13, 2006;

8. the "Plaintiff's Response to . . . Motion for Judicial Notice . . ." (document #25) filed December 18, 2006; <u>and</u>

9. the Defendants' "Reply Brief in Support of Motion for Judicial Notice . . ." (document #26) filed December 28, 2006.

The parties have consented to Magistrate Judge jurisdiction pursuant to 28 U.S.C. § 636(c), and these motions are now ripe for disposition.

Having carefully considered the parties' arguments, the record, and the applicable authority, the undersigned will <u>deny</u> the Plaintiff's Motion to Strike and the Defendants' Motion for Judicial Notice as moot, and <u>grant in part</u> and <u>deny in part</u> the Plaintiff's Motion for Summary Judgment, as discussed below.

## I. <u>PROCEDURAL AND FACTUAL BACKGROUND</u>

### A. <u>The Contractual Agreements</u>

This is an action seeking damages for breach of an indemnity contract. Relevant to the subject claims, in August 2004 Beck Electric Co., Inc. ("Beck Electric") contracted with Southside Constructors, Inc. ("Southside") to provide electrical subcontracting services for the Gaston County Administration Building construction project. However, due to its financial condition,[1] Beck Electric, through the agent it commonly used to obtain construction bonds, was required to "make

---

[1] Although neither of the parties expressly state this fact, the Court assumes that Beck Electric was in financial trouble due to the fact that the surety companies with which it normally did business were not willing to issue the bonds on its behalf.

2

inquiries to specialty surety underwriters who might be willing to issue the bonds if certain extraordinary conditions were met."

The Plaintiff (the selected specialty surety underwriter) agreed to issue the bonds if Defendant Beck Electric either paid a $70,000 premium or agreed to have a third-party funds administrator oversee the disbursement of funds from Southside to Beck Electric and/or Beck Electric's subcontractors. Because Beck Electric was unable to pay the $70,000 premium, it agreed to have all funds paid through a third-party administrator (and paid a $12,000 premium for the bonds).

On September 21, 2004, the parties executed the "General Agreement of Indemnity."[2] Among other things, the indemnity agreement provides:

> The Indemnitors will pay, when due, all premiums for each of such Bonds in accordance with the Surety's regular rates in effect on the date such Bonds becomes [sic] effective, as long as liability thereunder shall continue, and until the Surety is furnished with evidence satisfactory to the Surety of its discharge or release from the Bonds, or of all liability by reason thereof. The Indemnitors agree and bind themselves, their heirs, executors, administrators, successors and assigns, jointly and severally, to indemnify and save harmless Surety from and against any and all liability, loss, costs, damages or expenses of whatever nature or kind and arising out of or in any way connected with such Bonds, including but not limited to fees of attorneys and other expenses, cost and fees of investigation, adjustment of claims, procuring or attempting to procure the discharge of such bonds and attempting to recover losses or expenses from Indemnitors or third parties, whether the Surety shall have paid or incurred same, as aforesaid. The Indemnitors will indemnify the Surety against any and all liability, loss, damages, fees of attorneys, and other expenses which the Surety may sustain or incur by reason of or reliance upon representations made by the Indemnitors regarding defenses available to Principal and/or Surety to claims made against any such Bonds. . . .

Surety shall have the right to reimbursement of its expenses, premiums and attorneys'

---

[2]The indemnity agreement was executed between the Plaintiff and Beck Electric, James E. Becker (individually), Francis J. Loth (individually), and Rachel M. Loth (individually). Defendant Beck Electric is the Principal.

fees hereunder, irrespective of whether any Bond loss payment has been made by Surety. If the Surety has cause to enforce the terms of this Indemnity Agreement by filing suit against Indemnitors to recover sums due under this Agreement, it is understood by the Principal and Indemnitors that the Surety may recover its further expenses of such litigation, accrued interest and including 25% of such sums as attorneys' fees. Any debt accrued by the Surety, on behalf of Principal and Indemnitors will accrue interest at 12% per annum.

. . .

If a claim is made against Surety, or if the Surety deems itself insecure or otherwise in its sole discretion deems it necessary to establish a reserve for potential claims, and upon demand from Surety, Indemnitors shall deposit with Surety cash or other property acceptable to Surety, as collateral security, in sufficient amount to protect Surety with respect to such claim or potential claims and any expense or attorneys' fees.

. . .

The Plaintiff fulfilled its duties under the indemnity agreement by executing and delivering a performance bond and a payment bond to Southside – both in the amount of $700,000. Likewise, Defendant Beck Electric fulfilled its initial duties under the indemnity agreement by retaining Funds Administration Services, Inc. ("FAS") to serve as its third-party administrator.

FAS provided financial and alternative risk management services to the contract surety bond industry. In the light most favorable to the Defendants, the Plaintiff received a commission in exchange for an exclusive agreement to utilize FAS when issuing bonds. In executing its agreement with FAS, Defendant Beck Electric concluded that it had no opportunity to suggest revisions to the disbursement contract, which was signed on September 21, 2004 as presented.

The disbursement contract contained the following provisions:

    6.6.0    Funds Administrator shall reserve funds equivalent to the amount of liens, or documented and potentially supportable claims, plus a reasonable sum (not to exceed 25% of the lien or claim) for potential legal costs and attorney's fees relating to the lien or claim, for which Funds Administrator is aware in

connection with the Contract.

 6.6.1 Surety must execute a written consent to release funds from such reserves before any reserve funds may be released to the Contractor.

6.7.0 Funds Administrator has been informed that the Owner will be withholding and maintaining a retainage in the amount of ten percent (10%) ("Owner Retainage"). . . .

 6.7.2 Funds Administrator may release retainage being held in lieu of retention held by Owner, upon the Funds Administrator's satisfaction of completion and acceptance of the work performed under the Contract and upon receipt of written consent of Surety. If at any time, Owner reduces and/or releases retainage funds *prior* to completing the Project, Contractor must obtain written Consent of Surety. Upon receipt of Surety's consent, Funds Adminstrator shall then release such funds to Contractor.

6.8.0 In the event any of the following occur: (A.) Contractor is in default of its obligations under this Agreement; (B.) Contractor is in default under the Surety Bonds and/or any other agreement between Contractor and Surety; (C.) Contractor abandons the Contract; or (D.) Funds Administrator receives conflicting demands with respect to the Contract Funds, all funds then on deposit, or thereafter deposited, in the Funds Administration Account pursuant to this Agreement, shall be disbursed only with the written consent of Surety. Upon receipt of written demand form Surety following a default of the Contractor as defined in this Section, or Section 9.0.0 of this Agreement, the Contractor consents to, and directs the Funds Administrator to, release all contract funds held under this Agreement to Surety.

 6.8.1 In the event of any of the situations mentioned in Section 6.8.0 (A.), (B.), (C.) and/or (D.), Funds Administrator may continue to perform funds administration services on the subject matter for the Surety without being considered a conflict of interest.

8.2.0 Funds Administrator will maintain at its place of business, adequate records of Contract Funds received and disbursed, appropriate releases from subcontractors, material suppliers, and laborers in connection with the Contract and will permit inspection of these records at any reasonable time by Contractor or Surety, or the authorized representative of either.

8.4.0 Funds Administrator agrees to maintain a policy of insurance protecting Contractor and Surety from errors and omissions on its part in performing

obligations pursuant to this Agreement; further, Funds Administrator agrees to obtain fidelity type insurance protecting itself from acts of dishonesty, intentional fraud and criminal or malicious acts relating to its performance of its obligations pursuant to this Agreement. Funds Administrator will provide evidence of said coverage to both Contractor and Surety upon request.

8.6.0 Funds Administrator is authorized to provide Surety with copies of monthly disbursement reports and/or other information, if such is requested. This authorization does not create third party obligations, indemnitor relationships, or fiduciary duties between Funds Administrator, Surety and/or any other third party.

16.0.0 This Agreement has been jointly drafted by the parties hereto, each party has been afforded an opportunity to consult with counsel, enters into this Agreement voluntarily, and any ambiguity herein shall not be construed more strictly against one party than against the other.

**B. FAS's Misappropriation**

Beck Electric provided electric subcontracting services on the Gaston County construction project through Fall 2004 – utilizing materials and services provided by various lower tier subcontractors. Pursuant to the disbursement contract, Southside made payments to FAS for distribution to Defendant Beck Electric and its subcontractors. However, due to financial troubles of its own, FAS stopped disbursing funds it received from Southside to Defendant Beck Electric in January 2005.

James Becker, president of Defendant Beck Electric, contacted the Plaintiff, and in March 2005 the Plaintiff investigated FAS's failure to remit the funds. According to the Plaintiff, FAS misappropriated $96,577.84 of the funds it received from Southside.[3] By April 2005, Defendant Beck Electric had accumulated over $300,000 in unpaid expenses on the Gaston County project. Accordingly, on April 12, 2005, Defendant Beck Electric formally requested that the Plaintiff pay

---
[3]The Defendants do not dispute this amount.

outstanding invoices for the Gaston County project.

Aware of the problems with FAS, Southside made a payment of $102,808.42 directly to Defendant Beck Electric on April 28, 2005. Beck Electric used this money to pay its own expenses, apparently believing that the Plaintiff would pay the lower tier subcontractors. The Plaintiff intervened and requested that Southside make all future payments directly to it. Southside then paid $105,867.43 to the Plaintiff for work completed by Defendant Beck Electric.

In June 2005, the Plaintiff notified Defendant Beck Electric that it had posted reserves totaling $264,795.50, and demanded cash collateral to secure the reserve and compensate it for its incurred and anticipated loss.

In the meantime, FAS had notified its insurance carriers (on April 8, 2005) of potential claims due to its financial defaults, and subsequently filed for bankruptcy (on December 3, 2005). The insurance carriers have denied FAS's claims, and therefore the Plaintiff's claims, and are seeking a declaratory judgment in the bankruptcy action that they are not liable for the subject amounts.

The Plaintiff claims that as of August 2005, it had suffered net losses in the amount of $357,368.89. In addition, the Plaintiff has obtained a default judgment in this action against Frances J. Loth and Rachel M. Loth in the amount of $275,934.87. The Plaintiff seeks a total of $272,636.62, plus twelve percent interest, from the Defendants,[4] as well as twenty-five percent of

---

[4] This amount is detailed by the Plaintiff as follows: (1) $368,461.76 paid to bond claimants, none of which appears to be disputed; (2) $655 paid to a bond claimant, which Defendant Beck Electric argues was paid in error; (3) $9,397.29 in fees and expenses paid to "investigative consultants" as a result of the Defendants' default; and (4) $105,867.43 Southside paid the Plaintiff for Defendant Beck Electric's work. (The total of (1) through (3), minus the amount already paid to the Plaintiff by Southside is actually $272,646.62 – ten dollars more than what the Plaintiff seeks with this Motion.)

its total recovery in attorney's fees (pursuant to the terms of the indemnity agreement).

On October 12, 2006, the Plaintiff filed its Motion for Summary Judgment, which has been fully briefed as set forth above and is, therefore, ripe for determination.

On November 13, 2006, the Plaintiff filed a Motion to Strike portions of Defendant James E. Becker's affidavit, and related to the Motion to Strike, on November 30, 2006, the Defendants filed a "Motion for Judicial Notice of Adjudicative Facts." Although none of the evidence at issue in these two Motions is sufficient to create an issue of material fact, the undersigned <u>has</u> considered all of the Defendants' evidence and, accordingly, both Motions will be <u>denied as moot</u>.

## II. <u>DISCUSSION OF CLAIMS</u>

### A. <u>Standard of Review</u>

Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment should be granted when the pleadings, responses to discovery, and the record reveal that "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." <u>See also</u> <u>Charbonnages de France v. Smith</u>, 597 F.2d 406, 414 (4th Cir. 1979). Once the movant has met its burden, the non-moving party must come forward with specific facts demonstrating a genuine issue for trial. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).

A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). However, the party opposing summary judgment may not rest upon mere allegations or denials and, in any event, a "mere scintilla of evidence" is insufficient to overcome summary judgment. <u>Id</u>. at 249-50.

When considering summary judgment motions, courts must view the facts and the inferences

therefrom in the light most favorable to the party opposing the motion. Id. at 255; Miltier v. Beorn, 896 F.2d 848, 850 (4th Cir. 1990); Cole v. Cole, 633 F.2d 1083, 1089 (4th Cir. 1980). Indeed, summary judgment is only proper "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there [being] no genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (internal quotations omitted).

### B. Amount Owed Under the Indemnity Contract

The dispute here centers around the parties' obligations to each other under the terms of an indemnity contract. "As in the construction of any contract, the court's primary purpose in construing a contract of indemnity is to ascertain and give effect to the intention of the parties, and the ordinary rules of construction apply." Dixie Container Corp. v. Dale, 273 N.C. 624, 160 S.E.2d 708 (1968) (citations omitted).[5] Where the language of the indemnity contract is "clear and unambiguous," courts must interpret the contract as written. Kirkpatrick & Associates, Inc. v. Wickes Corp., 53 N.C. App. 306, 308, 280 S.E.2d 632, 634 (1981) (citations omitted).

"In an indemnity contract, the agreement will be construed to cover all losses, damages, and liabilities which reasonably appear to have been within the contemplation of the parties, but not those which are neither expressed nor reasonably inferrable from the terms." Id. Further, when there is an express indemnification contract, "a surety is entitled to stand upon the letter of his contract." Fidelity and Deposit Co. v. Bristol Steel & Iron Works, Inc., 722 F.2d 1160, 1163 (4th Cir. 1983) (citations omitted) (although applying Pennsylvania state law, cited generally in Old Republic Surety Co. v. Reliable Housing, Inc., 154 N.C. App. 520, 572 S.E.2d 442 (2002)).

---

[5]The parties do not dispute that North Carolina state law applies to the subject motion.

9

There is no question here that the parties entered into a valid indemnity contract, rather the issue is whether events occurring after execution of the contract excuse the Defendants from any liability they have incurred under the contract.

### 1. Pending Bankruptcy Action

The Defendants make several arguments as to why they should not be held responsible for the amounts actually paid by the Plaintiff on Defendant Beck Electric's behalf. The first of these arguments relates to FAS's pending bankruptcy action filed in the Southern District of Texas on December 3, 2005, in which the Bankruptcy Court is also considering the subject claims. It is undisputed that the Plaintiff has filed a proof of claim in the bankruptcy action for $96,077.84, and that Defendant Beck Electric is "scheduled as the holder of a pre-petition claim in the FAS bankruptcy petition."

The Defendants' principal argument regarding the bankruptcy action (that the bankruptcy trustee would not approve this action) is now moot, as the Plaintiff has subsequently received the trustee's permission to proceed in this case.

The Defendants' judicial estoppel argument (that the Plaintiff has taken inconsistent positions in this case and in the bankruptcy action) must also fail. Judicial estoppel is an "equitable doctrine that prevents a party who has successfully taken a position in one proceeding from taking the opposite position in a subsequent proceeding." King v. Herbert J. Thomas Memorial Hosp., 159 F.3d 192, 196 (4th Cir. 1998). The Defendants essentially argue that it is inconsistent for the Plaintiff to claim that FAS is responsible for this portion of the debt while arguing that the Defendants are also responsible. The essential resolution of this argument requires only that the Court point out that the

positions taken in the two tribunals are neither "opposite" nor even contradictory.

To the contrary, it is entirely reasonable that the Plaintiff would seek the money which was misappropriated by FAS in the bankruptcy action. In essence, the Plaintiff has paid $96,577.84[6] on the Defendants' behalf, which the Defendants are contractually required to reimburse. However, it is widely known that FAS misappropriated these funds, and therefore would also be at least potentially liable for the subject debt.

By way of analogy, if a lender loans money to John Doe to buy the Mona Lisa, and a few days later Bob Smith steals the painting, the lender is within its right to attempt to recover the painting from Bob Smith (to protect its interests should John Doe be unable to continue to make the loan payments), while at the same time it will continue to expect John Doe to make his loan payments even though the reason he borrowed the money has been stolen.[7] This is closely analogous to what the Plaintiff is attempting to do by its claims filed in the bankruptcy action. And, in fact, it is in the Defendants' best interest that the Plaintiff zealously seek this money from FAS and its insurers because any money that the Plaintiff recovers on Defendant Beck Electric's claims from another source will reduce the Plaintiff's net claim against Beck Electric dollar for dollar.

The fact that the Plaintiff can only recover once for its injuries here also addresses the Defendants' next argument. It is well settled in North Carolina that while a party is entitled to fully

---

[6] The facts show that the Plaintiff is seeking $96,077.84 in the bankruptcy action, but neither side disputes that FAS actually misappropriated $96,577.84. Although the parties have not explained this discrepancy, it is not material to the outcome in this case.

[7] The Court is aware of the Defendants' argument that it believes, under the facts of this case, that the lender essentially gave "Bob Smith" a key to the room where "John Doe" was keeping the Mona Lisa, but was then shocked to find out that "Bob Smith" used that key to steal the painting. However, because the undersigned has concluded that no agency relationship existed between FAS and the Plaintiff, it necessarily follows that the Plaintiff cannot be held responsible for FAS's misappropriation.

11

recover its damages, it is <u>not</u> entitled to double recovery for the same loss or injury. See <u>Knight Pub. Co., Inc. v. Chase Manhattan Bank, N.A.</u>, 137 N.C. App. 27, 34, 527 S.E.2d 80, 85 (2000). Indeed, "*any* amount paid by *anybody* . . . for and on account of any injury or damage should be held for a credit on the total recovery in any action for the *same injury* or damage." <u>Id.</u> (citations omitted, emphasis in original).

In any event, it is clear that the Plaintiff is <u>not</u> attempting to seek double recovery for the injury complained of here. Rather, as the Plaintiff points out, it:

> is merely attempting to obtain ***one*** satisfaction of its losses from pursuit of more than one source – Defendants, FASI, and the FASI insurers. Those actions have inured to the benefit of the Defendants. Recovery of any amount, let alone full recovery, from either of the alternative sources is not assured.

Pl.'s Reply, at 14-15.

The Plaintiff concedes that if it recovered any other funds after fully recovering from the Defendants, <u>the Defendants</u> would be entitled to the excess recovery. The undersigned agrees that should the Plaintiff recover any additional amounts on these claims from FAS or its insurers after the Defendants have satisfied the judgment in this action, the Plaintiff should be required to forward such funds to the Defendants or, if the Defendants have not yet satisfied this judgment, that any additional recovery from FAS or its insurers on these claims would constitute a credit for the Defendants toward the amount owed.

## 2. Relationship Between the Plaintiff and FAS

The Defendants next argue that they should not be required to pay the Plaintiff because its relationship with FAS amounted to a principal/agent relationship – and therefore that FAS's misappropriation of the Defendants' funds should be attributed to the Plaintiff.

12

There are several problems with this argument. First, the only exception to a provision in an indemnity agreement requiring a contractor to repay a surety for claims paid on bonds is "when the payment has been made through fraud or lack of good faith on the part of the surety," Bristol Steel, 722 F.2d at 1163 (internal citations and quotations omitted), which is clearly not the case here. Rather, the only allegation of fraud/bad faith in this case involves FAS's misappropriation of funds, which does not directly relate to the claims the Plaintiff paid on the bonds.

Second, for the Defendants to prevail on this argument FAS would have to be a mere agent of the Plaintiff, which is also not the case here.

In North Carolina, the two essential elements in a principal/agent relationship are: (1) "[a]uthority, either express or implied, of the agent to act for the principal," and (2) "the principal's control over the agent." Coastal Plains Utilities, Inc. v. New Hanover County, 166 N.C. App. 333, 344, 601 S.E.2d 915, 923 (2004) (internal citations and quotations omitted). "The critical element of an agency relationship is the right of control, and the principal must have the right to control both the means and the details of the process by which the agent is to accomplish his task in order for an agency relationship to exist." Wyatt v. Walt Disney World Co., 151 N.C. App. 158, 166, 565 S.E.2d 705, 710 (2002).

The Plaintiff argues that it was "not a party to the contract" between Defendant Beck Electric and FAS, had "no corporate affiliation with [FAS], such as parent, subsidiary, affiliate, etc.," and therefore, that FAS had no agency relationship with the Plaintiff.

To the contrary, in support of their argument that FAS is a "mere agent" of the Plaintiff, the Defendants note that:

- New York Marine's requirement that a third-party funds administrator serve

- as the conduit for payments from Southside to Beck Electric and Beck Electric's subcontractors;

- New York Marine's unwavering insistence that FAS – and only FAS – serve as such administrator;

- FAS's confederated business relationship with various surety companies, including New York Marine;

- the presentation of the Disbursement Contract to Beck Electric on a "take it or leave it" basis;

- Mr. Becker's testimony that "FAS represented the interests of New York Marine at all times" and his belief that FAS was New York Marine's agent;

- the Disbursement Contract's provisions authorizing FAS, in the event of a dispute with Beck Electric, to (1) release all funds FAS held to New York Marine; and (2) continue to perform funds administration services on the Administration Building Project for New York Marine's benefit;

- the Disbursement Contract's provisions that (1) vested New York Marine with the power to control the release of certain reserve and retainage funds; (2) authorized New York Marine to inspect FAS records at any reasonable time; and (3) required FAS to maintain both errors and omissions and fidelity-type insurance for the benefit of Beck Electric and New York Marine;

- New York Marine's investigation of FAS's wrongdoing at Mr. Becker's request; and

- New York Marine's notice to FAS's insurers and the proof of claim it filed in FAS's bankruptcy action.

In short and in summary, none of the facts cited by the Defendants, even in the aggregate, show that the Plaintiff possessed the requisite control over FAS for this Court to find there was an agency relationship. Much to the contrary, it is evident that the Plaintiff's relationship to the FAS/Beck Electric contract was more along the lines of a third-party beneficiary. See, e.g., Multi-State Contracting Corp. v. Midwest Indemnity Corp., 252 Ga. App. 449, 450, 556 S.E.2d 524, 526 (2001) (surety not liable for disbursement agent's misappropriation, noting that it is a "common business practice for a surety to require an insured

14

contractor to use a disbursing agent on a construction project").

It is apparent from the facts that Defendant Beck Electric was experiencing financial difficulty at the time it was awarded the Gaston County construction project. Unfortunately, this financial condition required it to accept terms for bond/surety coverage that a company in better financial condition might have turned down.[8] But for the existence of disbursing agents like FAS, however, Defendant Beck Electric might not have been able to obtain bond coverage to engage in the Gaston County project, and, in any event, these "big picture" considerations do nothing to negate or diminish the binding nature of the subject indemnity agreement.

### 3. Failure to Mitigate

The Defendants' final argument is that the Plaintiff could have avoided paying any amount under the bonds if it had allowed Southside to continue paying Defendant Beck Electric directly, rather than stepping in itself as a disbursement agent after FAS's misappropriation.

To the contrary, the Court concludes that it was reasonable under the circumstances for the Plaintiff to fear that Defendant Beck Electric would <u>not</u> use additional funds to retire the claims against the bonds. Indeed, Defendant Beck Electric used the one payment it did receive from Southside to pay its own bills rather than those of its lower tier subcontractors. <u>Accord</u> <u>Bristol Steel</u>, 722 F.2d at 1164-66 (finding it reasonable that surety paid claims on bond, even prior to determination of contractor's liability, to Pennsylvania Department of Transportation when faced with the threat that DOT would refuse to allow surety to participate in any DOT project).

---

[8]This is similar to a scenario where an individual with a "bad" credit history is forced to accept a higher interest rate than others might find available. While this seems unjust on its face, if creditors were not permitted to make special accommodations for "high risk" borrowers then this segment of the population would never be able to own their own home, buy a car, or obtain a credit card.

### 4. Single Disputed Fact

The Defendants have successfully disputed the validity of only one of the claims paid by the Plaintiff, that is, the Plaintiff's payment to Dallas Electrical & Plumbing of $655.00 for work involving the checking of motors in the basement, top level, and chiller towers of the project. The Defendants assert that this payment was actually for repairing damaged light fixtures and installing breakers, work which Defendant Beck Electric was not contractually obligated to provide.

For this reason, as to this single $655.00 claim, the undersigned will <u>deny</u> the Plaintiff's Motion for Summary Judgment. However, as to all of the remaining payments made by the Plaintiff for work performed on the Gaston County project, the Plaintiff's Motion must and will be <u>granted</u>. Specifically, the Plaintiff will be awarded damages in the amount of $261,939.33,[9] plus twelve percent (12%) interest per annum from the date of each disbursement per the terms of the subject contract.

### C. Attorney's Fees

The Plaintiff also seeks attorney's fees as provided in the subject contract. <u>See, e.g.</u>, <u>Bristol Steel</u>, 722 F.2d at 1166 (allowing recovery of attorney's fees based on express provision in indemnity contract); <u>and</u> <u>Reliance Ins. Co. v. Romine</u>, 707 F. Supp. 550, 553 (S.D. Ga. 1989) (same). North Carolina courts, however, have consistently refused to award attorney's fees based on a contractual obligation absent statutory authority to do so. <u>See, e.g.</u>, <u>Stillwell Enterprises, Inc. v. Travelers Indemnity Co.</u>, 300 N.C. 286, 289, 266 S.E.2d 812, 814-15 (1980).

The relevant statutory authority for the fees in this case would have to come from North Carolina General Statute § 6-21.2, which allows recovery of attorney's fees incurred to collect "upon any note,

---

[9]This amount represents the total amount of claims paid ($368,461.76), minus the disputed amount ($655) and the amount paid to the Plaintiff by Southside ($105,867.43).

conditional sale contract or other evidence of indebtedness," but limits recovery of attorney's fees to fifteen percent (15%) of the "outstanding balance" (where the contract provides for attorney's fees in a higher percentage of the outstanding balance, as is the case here). N.C. Gen. Stat. § 6-21.2.

Because an indemnity contract is not a note or conditional sale contract, the issue is whether it constitutes "other evidence of indebtedness." The North Carolina Supreme Court has defined this term as "any printed or written instrument, signed or otherwise executed by the obligor(s), which evidences on its face a legally enforceable obligation to pay money." Stillwell, 300 N.C. at 294, 266 S.E.2d at 817. Under this definition, the indemnity contract is clearly "evidence of indebtedness." It is a signed writing, executed by the obligors, which evidences a legally enforceable obligation to pay money. Accordingly, while North Carolina law generally does not allow recovery of attorney's fees, it must be allowed here because of the statutory exception.

For these reasons, the Plaintiff's request for attorney's fees will be granted in part, that is, the Plaintiff will be awarded an attorney's fee in the amount of $39,290.90 (15% of $261,939.33).

### III. ORDER

**NOW, THEREFORE, IT IS HEREBY ORDERED:**

1. The Plaintiff's ". . . Motion to Strike . . ." (document #20) is **DENIED** as moot.

2. The Defendants' "Motion for Judicial Notice of Adjudicative Facts" (document #23) is **DENIED** as moot.

3. The "Plaintiff's Motion for Summary Judgment . . ." (document #14) is **GRANTED IN PART** and **DENIED IN PART**, that is, the Court will enter judgment for the Plaintiff in the amount of $261,939.33, plus twelve percent (12%) interest from the date of each disbursement of the subject funds,

and will award attorney's fees in the amount of $39,290.90.

4. If the Plaintiff wishes to pursue its remaining claim (for $655.00), the parties are instructed to file their "Certification and Report of Federal Rule of Civil Procedure 26(f) Conference and Discovery Plan" <u>within thirty (30) days of the date of this Order</u>. If the Plaintiff does <u>not</u> wish to pursue its remaining claim, it shall file a Stipulation of Dismissal With Prejudice (of that portion of its claims only) <u>on or before the same date</u>.

5. The Clerk is directed to send copies of this Memorandum and Order to counsel for the parties.

**SO ORDERED, ADJUDGED, AND DECREED.**

Signed: January 16, 2007

_____
Carl Horn, III
United States Magistrate Judge